**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF SOUTH CAROLINA**
**AIKEN DIVISION**

**Case Management C/A No. 1:06-MN-6000**

| | | |
|---|---|---|
| IN RE: Graniteville Cases | ) | C.A. No. 1:06-CV-01736 |
| | ) | C.A. No. 1:06-CV-01738 |
| | ) | C.A. No. 1:06-CV-01739 |
| _____ | ) | C.A. No. 1:06-CV-01740 |

**MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT OF**
**DEFENDANT, OLIN CORPORATION**

**INTRODUCTION**

This consolidated litigation arises from the January 6, 2005 rail accident at

Graniteville, South Carolina in which a Norfolk Southern freight train struck a Norfolk

Southern locomotive and freight cars parked on an industry siding.  Sixteen cars derailed,

including a chlorine tank car known as UTLX 900270 ("the subject car") manufactured

and owned by defendant Union Tank Car Company ("Union Tank"), leased to and

operated by defendant Olin Corporation.  The subject car was struck by another car and

was breached, resulting in a release of chlorine from which nine persons died.

Olin has been sued by the plaintiffs in the four suits above captioned (Kathy W.

Harvey; Coy D. Harvey; Quinney Dederscheck; and James C. Whaley).  Each Complaint

alleges that the release was caused by the negligence of Olin and other defendants (Count

3) , and that the Olin is subject to "Strict/Absolute Liability" because, "Liquid chlorine

and chlorine gas are ultrahazardous substances" (Count 4).

Plaintiffs' liability experts have been disclosed and defendants have taken their

depositions..   No expert has expressed an opinion that the subject car was defective in

any respect or that Olin was at fault in its operation or maintenance.  Accordingly, plaintiffs cannot prevail on their negligence claims in Count 3.

With respect to Count 4, South Carolina recognizes no cause of action for strict or absolute liability arising from the transportation of "ultrahazardous substances," and plaintiffs cannot recover on such a basis as a matter of law. Moreover, to the extent that plaintiffs' claims are based on any alleged defect in the design, manufacture operation, maintenance or inspection of the subject car, they are preempted and barred by governing Federal law.   The matter is ripe for summary adjudication pursuant to Rule 56 (c), because there is no genuine issue as to any material fact, and Olin is entitled to judgment as a matter of law.

The relevant material facts of record are set forth in the Statement of Facts, below.

## STATEMENT OF FACTS

The National Transportation Safety Board (NTSB) investigated the Graniteville accident and issued its Railroad Accident Report NTSB/RAR - 05/04 (PB 2005-196304), a copy of which was identified in the deposition of plaintiff's expert, Paul Bodnar, and is attached hereto as Exhibit A.  The NTSB report sets forth the following relevant facts regarding the Graniteville accident and the subject car[1].

> "About 2:39 a.m. eastern standard time on January 6, 2005, northbound Norfolk Southern Railway Company (NS) freight train 192, while traveling about 47 mph through Graniteville, South Carolina, encountered an improperly lined switch that diverted the train from the main line onto an industry track, where it struck an unoccupied, parked train (NS train P22).  The collision derailed both locomotives and 16 of the 42 freight cars of train 192, as well as the locomotive and 1 of the 2 cars of train P22.  Among the derailed cars from train 192 were three tank cars containing chlorine, one of which was breached, releasing chlorine gas." (NTSB Report, Exhibit A, p. 1)

---

[1] "Courts have consistently held that the factual portions of an NTSB report are admissible into evidence, while excluding any agency conclusions on the probable cause of the accident [citations omitted]."  *Hurd v. United States,* 134 F.Supp.2d 745, 750 (D.S.C.2001), *affirmed,* 34 Fed. Appx. 77 (4th Cir.2002).

"The ninth car in the train (UTLX 900270), the punctured chlorine car, was built in 1993 by Union Tank Car Company. It was a DOT specification 105J500W tank car that was originally built as a specification 105S500W tank car. The last periodic qualification was in July 2004. The tank heads were manufactured from 53/64-inch plate, and the shell was manufactured from 0.777-inch carbon steel plate. Head and shell plates were specified as AAR specification TC-128-B normalized steel. This car had a thermal protection system consisting of 2 inches of ceramic fiber covered with 2 inches of fiberglass. This car was equipped with 1/2-inch full head shields.

Chlorine tank cars such as the punctured car are pressure tested to 500 pounds per square inch, gauge (psig), compared to 300 psig for tank cars used to transport anhydrous ammonia and liquefied petroleum gas. Because of the higher test pressure, chlorine tank car walls are thicker than those of lower-rated pressure tank cars. (NTSB Report, Exhibit A, p. 28)

The Safety Board performed Charpy impact testing of the steel from the tank car shell. * * * The chemical composition and tensile properties of the head and shell material met the specifications for AAR TC-128-B normalized steel. (NTSB Report, Exhibit A, p. 31)

During the derailment, the ninth car in the train, a tank car loaded with chlorine, was punctured. Emergency responders observed that the B-end coupler of the 11th car in the train, a car transporting steel coils, was in contact with the damaged tank jacket near the puncture in the tank shell and was covered with frost. * * * Metallurgical examination of the damage on the shell around the puncture documented several impression marks on the shell that matched damage found on projecting surfaces of the coupler. The Safety Board therefore concludes that the chlorine gas release that occurred in this accident resulted when the shell of the 9th car on the train was punctured by the coupler of the 11th car. (NTSB Report, Exhibit A, p. 49)

As previously noted, the 9th of 42 cars in the train was struck and punctured by the coupler of the 11th car transporting steel coils. The combined weight of the striking steel coil car and the rest of the trailing cars in the train was about 2,618 tons. The estimated impact speed was determined to be about 42 mph. This combination of mass and velocity subjected the punctured chlorine tank car to severe impact forces during the derailment, with the most concentrated forces being applied in the area struck by the coupler.

The punctured tank car was built in 1993, and therefore was required to have both the tank heads and the tank shell constructed of normalized steel. The normalizing heat treatment typically increases the fracture toughness and lowers the ductile-to-brittle transition temperature of steel plate. Thus, for a given composition of steel, normalized steel is less susceptible to catastrophic brittle fractures and requires more energy to fracture than non-normalized steel.

Chlorine tank cars such as the punctured ninth car are tested to a pressure of 500 psig compared to a test pressure of 300 psig for tank cars used to transport anhydrous ammonia and liquefied petroleum gas. To be rated for the increased operating pressure, the tanks of chlorine tank cars must have greater tank wall thicknesses than tanks of the lower pressure cars. **Because of the improved properties of normalized steel and the increased wall thickness, the punctured car was among the strongest tank cars currently in service.**" (NTSB Report, Exhibit A, pp. 50 – 51, emphasis added)

Plaintiffs identified Paul Bodnar,  Jim Burnett, Paul Byrnes, George Gavalla, Robert Halstead, James Loumiet, Sheldon Lustig and James Sottile as liability experts. Each of them has disclaimed any adverse opinion regarding the subject car, Olin's operation of it, or Olin's response to the accident.[2] The relevant deposition testimony of plaintiff's experts regarding the subject car and Olin's operation of it is set forth in Exhibit B hereto. The testimony of Mr. Bodnar is representative:

P . 232

2 First of all, do you have any opinions
3 regarding the design of the tank car that leaked
4 chlorine in the Graniteville incident?

5        A    I do not, no.

6        Q    You will not express the opinion that
7 the design of that tank car caused or contributed to
8 the Graniteville incident?

9        A    I will not.

---

[2]        Pertinent excerpts of the Plaintiffs' experts' depositions are attached as follows:  Exhibit C, Deposition of Jim Burnett; Exhibit D, Deposition of  Paul Byrnes; Exhibit E, Deposition of George Gavalla;  Exhibit F, Deposition of Robert Halstead; Exhibit G, Deposition of James Loumiet; Exhibit H, Deposition of Sheldon Lustig; and Exhibit I, Deposition of James Sottile.

10    Q    Do you have any opinions regarding the
11  manufacture of the tank car that leaked chlorine in
12  the Graniteville accident?

13    A    I do not.

14    Q    And you'll not express the opinion
15  that the manufacture of that tank car caused or
16  contributed to the Graniteville incident?

17    A    I will not.

18    Q    Do you have any opinions regarding
19  maintenance or repair of the tank car that leaked
20  chlorine in the Graniteville accident?

21    A    I do not.

22    Q    You will not express the maintenance
23  or repair history of the tank car caused or
24  contributed to the Graniteville accident?

25    A    I will not.

P. 233
1    Q    You will not express the opinion that
2  Olin Corporation violated any federal regulation
3  with respect to the Graniteville incident; is that
4  correct?

5    A    I will not.

6    Q    And you will not express any opinion
7  in this matter that Olin somehow failed to respond
8  in a timely manner to the Graniteville incident; is
9  that correct?

10    A    I will not.

(Deposition of Paul Bodnar, Exhibit B, 232:12 – 233:10)

## ARGUMENT

### A.    The Standard for Summary Judgment

Summary judgment is proper if the evidence, viewed in the light most favorable to the non-movant, demonstrates that there is no genuine issue as to any material face, and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986); *Evans v. Techns. Applications & Serv. Co.,* 80 F.3d 954, 958 (4th Cir.1996); *Am. Legion Post v. City of Durham,* 239 F.3d 601, 605 (4th Cir.2001).

A material fact is one "that might affect the outcome of the suit under governing law", and a "genuine" issue is one where "the evidence is such that a reasonable jury could return a verdict for the non-moving party."  *Celotex ,supra,*  477 U.S. at 323-25; *Am. Legion,* 239 F.3d at 605.  If the moving party would not bear the burden of proof at trial, its initial burden is met by pointing out that the nonmoving party has not made a sufficient showing on an essential element of it cause.  *Celotex,* 477 U.S. at 323-25. After the initial showing, summary judgment will be granted unless the opponent produces evidence upon which a reasonable jury could return in its favor.  *Matsushita, supra, 475* U.S. 574, 587.  As this Court has stated,

> "There is no genuine issue of material fact where, 'the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party.' [citing *Matushita*).  *  *  *  If the nonmoving party fails to set forth sufficient evidence to establish the existence of every element to the cause of action, then Rule 56(c) requires that summary judgment be granted."
>
> *Green v. Snavely Forest Products Co*., 2006 WL 2076950 (D.S.C. 2006), at *1.

The record in this litigation shows that there is no genuine issue as to any material fact, and Olin is entitled to judgment as a matter of law under Rule 56(c)

**B.      Plaintiffs Cannot Prevail on the Causes of Action Pleaded in Their Complaints**

**1.      Count 3 --Negligence**

In Count 3 of each Complaint it is alleged that Olin was negligent in the following respects:

> "(a)    failure to properly design the pressurized tanks that contained the liquid chlorine in order to prevent public exposure;
>
> (b)    failure to ensure the safe transport of liquid chlorine;
>
> (c)    failure to properly and safely maintain the pressurized tanks that contained the liquid chlorine;
>
> (d)    failure to properly inspect or maintain railroad cars and/or pressurized tanks carrying the liquid chlorine manufactured and/or distributed by Defendants in order to prevent public exposure;
>
> (e)    failure to respond in a timely manner to prevent prolonged exposure to the public and Plaintiff."

Under South Carolina law, in a negligence action, plaintiffs have the burden of proof to show:  (1) the defendant owes a duty of care to the plaintiff; (2) the defendant breached the duty by a negligent act or omission; (3) the defendant's breach was the actual and proximate cause of plaintiff's injury; and (4) the plaintiff suffered an injury or damages.  *Hurst v. East Coast Hockey League, Inc.*, 353 S.C. 596, 637 S.E.2d 560 (2006).

Actionable negligence is based upon the breach of a duty to do or refrain from doing some particular act.  *Hodge v. Crafts-Farrow State Hosp,* 286 S.C. 437,  334

S.E.2d 818 (1985).  A breach of duty exists when it is foreseeable that one's conduct may likely injure the person to whom the duty is owed.  *Bailey v. Segars,* 346 S.C. 359, 366, 550 S.E.2d 910, 914 (Ct. App. 2001) *cert. dismissed* 354 S.C. 57, 579 S.E.2d 605 (2003).  Proximate causation requires proof of: 1) causation in fact; and 2) legal causation.  *J.T. Baggerly v. CSX Transp., Inc.,* 370 S.C. 362, 635 S.E.2d 97 (2006).  Causation in fact is proved by establishing that the injury would not have occurred "but for" the defendant's negligence, and legal cause is proved by establishing foreseeability.  *Id.*

Based on the undisputed record, plaintiffs cannot establish that their alleged damages were caused by the breach of any duty on Olin's part.

As set forth above, the NTSB report states that the subject car was punctured by a total impact weight of over 2,600 tons.  The NTSB report reflects that it was designed and manufactured in accordance with highest industry specifications and standards applicable to chlorine tank cars--including, but not limited to, the use of "normalized" steel in its construction, which the NTSB stated "is less susceptible to catastrophic brittle fractures and requires more energy to fracture than non-normalized steel."  As a result, the NTSB report says that, "the punctured car was among the strongest tank cars in service, "  and concludes that, "even the strongest tank cars in service can be punctured" in accidents such as that which occurred at Graniteville. (NTSB Report, Exhibit A, pp. 50-51).  The NTSB report further reflects that the punctured care had its last periodic qualficiation inspection in July, 2004 (less than six months before the accident) and found no deficiencies in its pre-accident maintenance or inspection. (NTSB Report, Exhibit A, p. 28)

Moreover, none of plaintiffs' liability expert witnesses expresses an opinion that the design, manufacture, maintenance or operation of the subject car was deficient in any respect.

Plaintiffs' expert, Jim Burnett, a former member of the NTSB, testified that he has been involved again in many policy issues involving tank cars and claimed to have made "a major contribution to improving tank car safety." (Deposition, Exhibit B, 237:6 - 13) He further testified that plaintiffs' experts thought that "the Safety Board's examination [of the subject car] had been sufficient," (Deposition, Exhibit B, 235:22 – 24), and that the car is "not an issue in this litigation." (Deposition, Exhibit B, 236: 9 - 17). Plaintiffs' expert James Sottile testified that he had read the NTSB report and had no reason to disagree with any of the factual findings of the NTSB report relating to the chlorine tank car. (Deposition of James Sottile, Exhibit B,  167:23 -  168:17).

Plaintiffs cannot sustain their burden to show that Olin was negligent and that such negligence caused or contributed to their alleged injuries.  The NTSB report and the unanimous opinions of plaintiffs' own experts negative any possible issue of fact regarding Olin's conduct.  The subject car met all of the applicable governmenal and industry standards for chlorine tank cars, and was "one of the strongest tank cars currently in service."  None of plaintiffs' experts find any fault on Olin's part in its operation, maintenance or inspection, or in Olin's response to the accident and the resulting chlorine release.  Summary judgment is appropriate in a rail car case based on negligence where no experts can point to any evidence of a defect in design or articulate any reasonable act or omission on the part of defendants that would have prevented the occurrence.  *Messing v. CSX Transportation, Inc.,* 172 F.3d 44, 1999 WL 14122 *2 (4th

Cir. 1999).  Accordingly, there must be judgment for Olin on plaintiffs' negligence claims as a matrer of law.

      **2.**      **Count 4--"Strict/Absolute Liability"**

Count 4 of each Complaint contains the following allegations (the following paragraph numbering below is from the Whaley Complaint):

<u>"COUNT 4</u>

(Strict/Absolute Liability of Olin, Union Tank, and Rhodia)

XXIX.

Liquid chlorine and chlorine gas are ultrahazardous substances.

XXX.

Exposure to liquid chlorine or chlorine gas is incompatible with human health.  They are ultrahazardous chemical substances which cause immediate personal injury, disability, and death upon brief exposure.

XXXI.

Chlorine gas, when released into the air, is a silent, invisible, and deadly killer to which human beings have no natural defense.

XXXII.

Olin, Union Tank, and Rhodia were engaged in the business of producing, storing, distributing, and moving within interstate and intrastate commerce liquid chlorine which in the absence of extreme and extraordinary care will cause serious and permanent injury and death to humans.

XXXIII.

Under the facts and circumstances of the catastrophe of January 6, 2005, it is clear that Olin, Union Tank, and Rhodia failed to properly and safely store, maintain, transport, and control the ultrahazardous chlorine and as a direct and proximate result thereof Defendants breached their absolute duty of care owed to the public in general.

XXXIV.

Olin, Union Tank, and Rhodia are held to heightened duty of care as a result of their activities associated with the manufacture, distribution, storage, ownership, sale and/or transportation of liquid chlorine and as such have absolute liability for injuries and damages which occur as a result of the discharge of such an ultrahazardous substance into the environment.

XXXV.

The pressurized tanks and related apparatus, the puncture of which caused the exposure of the toxic chemicals and injury to Plaintiff were the responsibility of Olin, Union Tank, and Rhodia, their employees, and/or agents.

XXXVI.

The acts and injuries described herein are in no way the fault of Plaintiff, but rather that of Olin, Union Tank, and Rhodia, which released upon the public an inherently ultrahazardous substance.

XXXVII.

Olin's, Union Tank's, and Rhodia's responsibility for the storage and transportation of the liquid chlorine and other dangerous substances which resulted in Plaintiff's injuries created a heightened duty of care, the breach of which makes them strictly or absolutely liable.

XXXVIII.

The foreseeable release of ultrahazardous toxic chemicals described herein was the direct and proximate result of the acts and omissions of Olin, Union Tank, and Rhodia, their employees and/or agents."

These allegations state no cause of action for strict liability under South Carolina law.

      **a.**      **Strict Products Liability**

Under South Carolina law, in a products liability action based on strict liability, a

plaintiff must establish that: 1) he was injured by the product; 2) the product, at the time

of the accident, was in essentially the same condition as when it left the hands of the defendant, who is engaged in the business of selling such product; and 3) the injury occurred because the product was in an unreasonably dangerous, defective condition. *Anderson v. Green Bull, Inc.,* 322 S.C. 268, 270,  471 S.E.2d 708, 710 (Ct. App. 1996); *Rife v. Hitachi Construction Machinery Co.,*  363 S.C. 209, 215,  609 S.E.2d 565, 568-69 (Ct.. App. 2005); *Marchant v. Mitchell Distributing Company,* 270 S.C. 29, 35, 240 S.E.2d 511, 513 (1977);  *see also* S.C. Code Ann. § 15-73-10(1) (1976).  Plaintiff must plead and prove that a **product defect** was the proximate cause of the injury sustained, and summary judgment in favor of defendants where the plaintiff fails to show that a product was defective.  *Rife, supra,* 609 S.E.2d at 571; *Marchant, supra,*  240 S.E.3d at 514.

In the cases at bar plaintiffs allege no defect in the design or manufacture of Olin's chlorine product or the subject car.  Even if they did, such a claim is precluded by the testimony of plaintiffs' experts.  Accordingly, Plaintiffs cannot support a claim based on strict products liability.

### b.    Strict Liability Predicated on Ultra-Hazardous Activity

Plaintiffs appear to base Count 4 on the premise that chlorine is an "ultrahazardous toxic chemical."   However, there is no cause of action under South Carolina law for distributing an "ultrahazardous product."

South Carolina adopted the Restatement (Second) of Torts § §519 and 520 with respect to strict liability for abnormally dangerous or ultra-hazardous ***activities*** in *Wallace v. A.H. Guion & Co.,* 237 S.C. 349, 117 S.E.2d 359, 361 (1960), a blasting case. Section 519 provides that: (1) one who carries on an abnormally dangerous activity is

subject to liability for harm to the person, land or chattels of another resulting from the activity, although he has exercised the utmost care to prevent the harm; and (2) this strict liability is limited to the kind of harm, the possibility of which makes the activity abnormally dangerous.

Section 520 of The Restatement states that in determining whether an activity is abnormally dangerous, the following factors are to be considered:

(a)    existence of a high degree of risk of some harm to the person, land or chattels of others;
(b)    likelihood that the harm that results from it will be great;
(c)    inability to eliminate the risk by the exercise of reasonable care;
(d)    extent to which the activity is not a matter of common usage;
(e)    inappropriateness of the activity to the place where it is carried on; and
(f)    extent to which its value to the community is outweighed by its dangerous attributes.

*Wallace* involved an action for damages asserted by a landowner against a sewer ditch excavation company that was brought after the plaintiff's home was severely damaged by violent earth vibrations and shock waves caused by dynamite explosions on a parcel of property that was adjacent to the plaintiff's.    The court held that blasting was an ultrahazardous activity and imposed strict liability on the defendants for the damage caused by the excavation.  *Wallace, supra,* 117 S.E.2d 359, 361.

Under the Restatement criteria adopted by South Carolina in *Wallace*, the transportation of bulk chlorine by rail cannot be deemed an "ultrahazardous activity" akin to blasting. Although chlorine is unquestionably a hazardous material, as is discussed more fully below, its interstate transportation by rail is regulated intensively and in great detail by the United States Department of Transportation (DOT).   Those regulations ensure that no undue risks attend its carriage by rail.

South Carolina courts have never applied the ultrahazardous activity doctrine to the handling of hazardous chemicals. *See Shockley v. Hoechst Celanese Corporation,* 996 F.2d 1212, 1993 WL 241179 (4th Cir. 1993) (unpublished opinion). In *Shockley* the plaintiffs asserted several causes of action, including strict liability for ultrahazardous activity, against a chemical reclamation contractor and manufacturer to recover for contamination of groundwater on the site of a former chemical reclamation plant that resulted from chemical leaks and spills at the site. After a jury verdict for plaintiffs, the district court denied the defendants' motions for judgment as a matter of law. The Fourth Circuit affirmed in part and reversed in part, holding that the defendants were entitled to judgment as a matter of law on the strict liability cause of action, stating that the strict liability doctrine in South Carolina "has been confined to a small number of ultrahazardous activities," citing *Wallace, supra,* and *Snow v. City of Columbia,* 409 S.E.2d 797, 800, 305 S.C. 544, 549 (Ct. App. 1991). *Shockley,* 1993 WL 241179 at *5.

*Wallace* involved an action for damages asserted by a landowner against an excavation contractor after the plaintiff's home was severely damaged by violent earth vibrations and shock waves caused by dynamite used by the defendant on property adjacent to the plaintiff's. The South Carolina Supreme Court held that blasting was an ultrahazardous activity and imposed strict liability on the defendants for the damage caused by the excavation. *Wallace,* 117 S.E.2d at 361.

In *Snow,* a homeowner brought a suit against a municipality for damage to his residence caused by the discharge of water from a leaking water main. *Snow v. City of Columbia,* 409 S.E.2d 797, 798, 305 S.C. 544, 549 (Ct. App. 1991). The Court of Appeals reversed a verdict in favor of the plaintiff on strict liability, holding that such

cause of action could not be established for the release of water. *Snow,* 409 S.E 2d. at 801.

The Fourth Circuit said in *Shockley* that in the absence of guidance from South Carolina's courts or legislature, "we as a federal tribunal refuse to sanction such an extension of the state's strict liability doctrine."    Nor does South Carolina law support applying the ultrahazardous activity doctrine to the transportation of chlorine by rail. Accordingly, there must be judgment for Olin on Count 4 as a matter of law.

**3.    Plaintiffs' Claims Are Preempted by Federal Law**

The interstate transportation of bulk chlorine by rail is regulated intensively and in detail by the United States Department of Transportation ("DOT") pursuant to Federal statutes.  The Hazardous Materials Transportation Law, 49 U.S.C. § 5101 *et seq.* ("HMTA"), governs hazardous materials transportation in the United States.  In HMTA Congress delegated to the Secretary of Transportation the power to designate a material or a group or class of materials as hazardous when the Secretary decides that transporting the material in commerce in a particular amount and form may pose an unreasonable risk to health and safety or property. 49 U.S.C. § 5103(a). The Secretary is also charged with the responsibility of prescribing regulations for the safe transportation of hazardous materials. *Id.* § 5103(b)(1).

Moreover, the Federal Railway Safety Act, 49 U.S.C. §20101 *et seq.* ("FRSA"} governs "safety in every area of railroad operations and reduce railroad-related accidents and incidents." *Id.* § 20101.  FRSA authorizes the Secretary of Transportation to promulgate regulations and issue orders for railroad safety. *Id.* § 20103. It also contains an express preemption provision, which states that a state may "adopt or continue in force

a law, regulation or order related to railroad safety," until the Secretary of Transportation

"prescribes a regulation or issues an order covering the subject matter of the State

requirement:

> A State may adopt or continue in force a law, regulation, or order related to railroad safety or security until the Secretary of Transportation (with respect to railroad safety matters) . . . prescribes a regulation or issues an order covering the subject matter of the State requirement.

49 U.S.C. § 20106.

FSRA preemption thus prohibits the State of South Carolina from imposing any

requirement "related to railroad safety" once DOT has acted.

The Supreme Court has held that, "Legal duties imposed on railroads by the

common law fall within the scope of these broad phrases." *CSX Transportation, Inc. v.*

*Easterwood*, 507 U.S. 658, 664, 113 S.Ct. 1732, 1737 (1993). *Easterwood* also holds

that the "plain terms" of the FRSA "do not limit the application of its express pre-

emption clause to regulations adopted by the Secretary pursuant to the FSRA." Instead,

they apply to any railroad safety regulation that DOT promulgates, "*regardless of the*

*enabling legislation*." 507 U.S. at 663, 113 S.Ct. at 1738, fn.4 (emphasis added). Thus,

"FSRA preemption relates to *all* rules and regulations regarding railroad safety

*promulgated by the Secretary* whether or not such regulations are promulgated by the

FRA through power delegated by the Secretary. " *CSX Transportation, Inc. v. Public*

*Utilities Com'n,* 901 F.2d 497, 501 (6th Cir. 1990) (emphasis in original). Thus, the

regulations pertaining to the design and operation of chlorine tank cars promulgated by

the Secretary pursuant to HMTA also preempt State common law claims covering that

subject matter.

The FRSA has been applied to preempt state tort law claims pertaining to chlorine tank cars.   *Roland v. Olin Corporation,* 1996 WL 943902, at *3   (E.D. Mich. 1996); *Ouellette v. Union Tank Car Co.*, 902 F. Supp. 5, 10 (D. Mass. 1995).

> "If state common law tort claims were permitted to proceed despite this Congressional intent [to create uniformity on the railroads] on the ground that the purported tortfeasor had in some way allegedly failed to comply with the federal standards, then manufacturers would inevitably be subjected to varying interpretations of the federal regulations in the different states. Inevitably, these tort actions would generate precisely those inconsistencies in railroad safety standards that Congressional action was intended to avoid."

*Roland v. Olin Corporation,* 1996 WL 943902, at *3.  *See also Mehl  v. Canadian Pacific Railway*, 417 F.Supp.2d 1104, 1120  (D. N.D. 2006) (common law claims for negligent maintenance of anhydrous ammonia tank car held preempted by FRSA and HMTA, citing *Ouellette*,  *supra*).

The Secretary has promulgated extensive regulations covering the design maintenance, inspection, and repair of chlorine tank cars.  Under *Easterwood* and the plain terms of the FRSA, the State of South Carolina may not impose any common law requirements in those areas of railroad safety.

49 C.F.R. part 179 governs specifications for rail cars used for transportation of hazardous materials.   Subpart B sets forth general design requirements contained in 49 C.F.R. §§ 179.10 through 179.22,  which pertain to tank mounting, welding certification, interior heating systems, tank car capacity and gross weight limitation, coupler vertical restraint systems, pressure relief devices, tank-head puncture-resistance systems, thermal protection systems, service equipment and protection systems, and marking, respectively.

The subject car was a pressure tank car subject to the requirements of Subpart C of part 179, 49 C.F.R. §§ 179.100 – 179.103-5.   49 CFR §179.100-1 provides that tanks

built under these specifications must comply with the requirements of §§ 179.100, 179.101, 179.102 and 179.103. Detailed regulations on insulation, thickness of plates, materials, tank heads, welding, post-weld heat treatment, manway nozzles and protective housing, venting, bottom outlets, attachments, closures for openings, tests of tanks, tests of safety relief valves, and stamping are set forth in §§ 179.100-3 through 179.100-20. The subject car fully complied with these requirements.

As stated in the NTSB report, the subject car was a DOT specification 105J500W tank car built in 1993, and as such was required to have both the tank heads and the tank shell constructed of normalized steel. The chemical composition and tensile properties of the head and shell material met the specifications for AAR TC-128-B normalized steel. (NTSB Report, Exhibit A, p. 31).

Chlorine tank cars such as the subject car are required by 49 CFR part 179 to be tested to a pressure of 500 psig.  As a result, the tanks of chlorine tank cars must have greater tank wall thicknesses than tanks of the lower pressure cars.  Because of this, the subject car was "among the strongest tank cars currently in service."   (NTSB Report, Exhibit A, pp. 50 – 51).

The Secretary has also promulgated detailed regulations covering the maintenance, reconditioning, repair, inspection and testing of the chlorine tank cars. which are set forth in Subpart F of 49 C.F.R  Part 180.   Anyone performing such functions "shall perform that function in accordance with this part."  49 C.F.R. § 180.501(b). 49 C.F.R. § 180.2(a) provides that anyone performing such functions "shall perform that function in accordance with this part."  Section 180.3(a) prohibits the use of

any container unless it is "maintained, reconditioned, repaired, or retested, as appropriate, in accordance with this part."

Subpart F requires immediate inspections if the car appears to be damaged and periodic inspections at 10 year intervals in any event. 49 C.F.R. § 180.509(b) and (c). The periodic inspections must include a visual inspection, tests for structural integrity and thickness, and examination of the safety systems. 49 C.F.R. § 180.509(d) through (h). If repairs are necessary, they must conform to the requirements of appendix R of the AAR Specifications for Tank Cars. 49 C.F.R. § 180.513(a). The subject car underwent its periodic inspection and qualification in July 2004. (NTSB Report, Exhibit A, p. 28).

Clearly, the Secretary of Transportation has adopted regulations "covering the subject matter of" the design, manufacture, operation, maintenance and inspection of pressure tank cars used for transportation of bulk chlorine, including the subject car. Under *Easterwood,* plaintiffs' South Carolina common law claims relating to the subject car are preempted and barred by FRSA.

## CONCLUSION

There is no genuine issue as to any material fact, and Olin is entitled to judgment as a matter of law under Rule 56(c) as to all claims asserted against it in these cases. Olin requests the Court to enter an order awarding judgment in its favor and against plaintiffs in each of the captioned cases; awarding Olin its recoverable costs and expenses incurred

in defending these actions; and awarding it such other and further relief as the Court may find just and proper in the circumstances.

March __6__, 2007                    Respectfully Submitted,

BUIST  MOORE SMYTHE McGEE, P.A.


_____/s David S. Yandle_____
James D. Myrick (Fed. ID #4849)
David Yandle (Fed. ID #5355)
5 Exchange Street, P. O. Box 999
Charleston, SC 29402
(843) 722-3400

HUSCH & EPPENBERGER, LLC


_____/s Daniel P. Jaffe_____
Daniel P. Jaffe
Mark A. Smith
190 Carondelet Plaza, Suite 600
St. Louis, MO 63105-3441
(314) 480-1500

*ATTORNEYS FOR DEFENDANT OLIN CORPORATION*

## <u>CERTIFICATE OF SERVICE</u>

This will certify that on the _6__ day of March, 2007, the foregoing document was served via electronic service on counsel of record to those attorneys who are currently registered through the Federal Court's Electronic Case Filing System and via first-class, U.S. mail on the following who are not registered users:

Seth Cortigene
Cortigene Law Firm
1200 State Highway 146 South, Suite 190
Laporte, TX 77571

Joe G Hollingsworth
Katharine R Latimer
Frank Leone , Jr
Spriggs and Hollingsworth
1350 I Street NW,  Suite 900
Washington, DC 20005

_____s/ David S. Yandle,_____